IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DE-VAUNTE J. TAYLOR,<br><br>      Plaintiff,<br><br>vs.<br><br>JAMES E. HOLTMEYER,<br><br>      Defendant. | 4:14-CV-3127<br><br>MEMORANDUM AND ORDER |

  De-Vaunte Taylor is suing James Holtmeyer, an Omaha police officer, for allegedly using excessive force when arresting Taylor. Holtmeyer moves for summary judgment, contending that the force used was objectively reasonable and that he is entitled to qualified immunity. The Court agrees that Holtmeyer is entitled to qualified immunity, and will grant Holtmeyer's motion for summary judgment.

## I. BACKGROUND

  The sequence of events that led to Taylor's May 31, 2013 arrest began with mistaken identity. A domestic assault was reported to Omaha police. Filing 72-1 at 1. Specifically, the victim reported that a man had assaulted her with a baseball bat, and that the suspect drove a black Chevrolet Tahoe in which he kept a handgun and drugs. Filing 72-1 at 1. The victim identified the suspect by name and provided police with the license plate number of the vehicle. Filing 72-1 at 1.

  Meanwhile, Taylor was at a friend's house, but needed to run an errand, and was unable to get a ride, so he asked if he could borrow his friend's vehicle. Filing 78-5 at 9-10. She said he couldn't, because her plates were expired, but he could borrow her cousin's vehicle instead. Filing 78-5 at 9. Unfortunately for Taylor, his friend's cousin was the domestic assault suspect police wanted, and the vehicle Taylor was borrowing was the black Tahoe police were looking for. *See* filing 78-1 at 27-28, 42-44.

  Holtmeyer was on uniformed patrol duty, in a marked cruiser, and was looking for the domestic assault suspect. Filing 72-1 at 1; filing 78-1 at 37. He went to the area of 41st Street and Ames Avenue, where he had heard the suspect might be located. Filing 78-1 at 36. Holtmeyer was stopped at a stop sign on 41st Street when he saw a black Tahoe drive by, headed east on Ames Avenue. Filing 78-1 at 39-41. The Tahoe's driver was, according to

Holtmeyer, speeding, and made an unlawful lane change. Filing 78-1 at 42. Holtmeyer saw from the license plate that it was the vehicle he was looking for. Filing 78-1 at 44. Based on the traffic infractions and reported domestic assault, Holtmeyer decided to initiate a stop. Filing 78-1 at 44.

Taylor was driving the Tahoe. Filing 73 at 2.[1] For separate reasons, Taylor had decided to abandon his errand and return to his friend's house, and had pulled into a barbershop parking lot to turn around. Filing 78-5 at 14. Taylor pulled into a parking space adjacent to the building, and was preparing to back out again when Holtmeyer pulled in behind, blocking Taylor from backing out. Filing 78-1 at 44-45. Holtmeyer had activated his cruiser's lights just as he pulled into the parking lot. Filing 78-1 at 45; filing 72-2 at 19:50:53.

Things happened very quickly after that. Holtmeyer got out of his cruiser and drew his sidearm. Filing 78-1 at 60-61. Taylor began to back the Tahoe up, but stopped when he saw the cruiser behind him and heard Holtmeyer shouting at him. Filing 78-5 at 16-17. Taylor said that because of the height of the Tahoe and its tinted windows, all he could see was that there was a black car behind him. Filing 78-5 at 16. Taylor saw that Holtmeyer had a gun drawn, but said he had not immediately realized Holtmeyer was a police officer. Filing 78-5 at 17.

Holtmeyer directed Taylor to raise his hands, and opened the driver's-side door of the Tahoe. Filing 78-1 at 61. Taylor got out of the vehicle, raised his hands, and turned to face the vehicle. Filing 78-1 at 62; filing 78-5 at 19. Holtmeyer held Taylor by or near the collar of his T-shirt and, after Taylor turned around, holstered his firearm. Filing 72-2 at 19:51:09-13; filing 78-1 at 63. Holtmeyer had his left arm around Taylor's left side, between Taylor and the driver's seat, and took Taylor's right arm with his right hand. Filing 72-2 at 19:51:13; filing 78-1 at 63. Holtmeyer said he was trying to handcuff Taylor, because he had just seen a firearm in the vehicle near the driver's seat. Filing 78-1 at 63-64. There was, in fact, a loaded handgun and spare magazine on the floor of the vehicle near the driver's seat. Filing 73 at 3.

Next, Taylor fell into the front seat of the Tahoe. Filing 72-2 at 19:51:17. According to Taylor, he felt Holtmeyer push him sideways and down, "like when . . . someone hip tosses you." Filing 78-5 at 21. But Holtmeyer said that he was trying to get Taylor's hands in a position to put

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1).

handcuffs on, and Taylor fell into the vehicle. Filing 78-1 at 64-65. Holtmeyer testified that:

> as I recall the incident, I had him, and I was trying to prevent him from going back into the car, and I was trying to take control of his body, and his momentum took him to the left, back into the car. I didn't intentionally push him or pull him into that vehicle, but he ended up going into the vehicle.

Filing 78-1 at 65. Holtmeyer explained that he wouldn't have "intentionally push[ed] a guy into a car where [he] saw a gun," and that "the last thing" he would want to do is push a suspect back into a car to have access to a gun or potentially escape. Filing 78-1 at 65.

Although Taylor said that Holtmeyer fell into the vehicle on top of him, filing 78-5 at 22, it is clear from the video taken by the cruiser's onboard recording system that Holtmeyer did not lose his footing. *See* filing 72-2 at 19:51:17. Holtmeyer described his position as "behind" Taylor with his "upper body . . . over him." Filing 78-1 at 66. For a few seconds, because Taylor's upper body was in the vehicle, it is not clear on the video where the parties' hands were. Filing 72-2 at 19:51:17-24 Then, Holtmeyer pulled Taylor from the vehicle, with his left arm around Taylor's neck and his right hand pulling on Taylor's right arm. Filing 72-2 at 19:51:24. Taylor described that as a "chokehold." Filing 78-5 at 24. According to Holtmeyer, he was not intentionally applying a chokehold at that point: instead, he was just trying to "get a grip" and pull Taylor out of the vehicle. Filing 78-1 at 67-68. Taylor fell to the ground and then got up again, with Holtmeyer retaining his hold around Taylor's neck. Filing 72-2 at 19:51:25-29.

Holtmeyer, calling Taylor by the domestic assault suspect's name, told Taylor to stop struggling and that he was going to jail. Filing 78-5 at 24. Taylor was grasping at Holtmeyer's left arm with his right hand. Filing 72-2 at 19:51:31. Taylor said that he was reaching for his own throat, trying to breathe and loosen Holtmeyer's grip. Filing 78-5 at 26-28. Taylor said he was "lightheaded, you know, discombobulated, you know." Filing 78-5 at 28. Then, as Taylor was grasping at Holtmeyer's arm, Holtmeyer struck Taylor in the face, once, with a closed fist. Filing 72-2 at 19:51:32-33. Holtmeyer explained he punched Taylor "[b]ecause [Taylor was] resisting arrest, there's a firearm present, and [he] believed [his] life was in danger, and [he's] trying to take [Taylor] into custody." Filing 78-1 at 69.

After the punch, there were a few more seconds of wrestling, and the two men fell to the ground, out of the frame of the cruiser's video recording. Filing 72-2 at 19:51:33-37. But a video recorded on a bystander's mobile

phone picks up the scene just a few seconds later from a better vantage point.² Filing 72-3. Holtmeyer still had his arm around Taylor's neck; according to Holtmeyer, this was now a "Level I Lateral Vascular Neck Restraint." Filing 73 at 2-3. Holtmeyer repeatedly ordered Taylor to put his hands behind his back; Taylor was slow to pull his right arm back into position to be handcuffed, although that may well have been because Holtmeyer was, at this point, essentially kneeling on him. Filing 72-3 at 0:06-27. Taylor can be heard insisting that he wasn't fighting Holtmeyer, and asking repeatedly why Holtmeyer had punched him. Filing 72-3 at 0:14-1:19. Holtmeyer managed to successfully handcuff Taylor, and kept him on the ground for a little under a minute, until more officers arrived. Filing 72-3 at 0:35-1:19.

Holtmeyer told the first officer who can be seen arriving that there was a gun underneath the seat of the Tahoe. Filing 72-3 at 1:19-21. Holtmeyer may have been concerned about the weapon because, by this time, a crowd had gathered—earlier, he had ordered someone off-screen not to go near the car. Filing 72-3 at 0:12-14. Holtmeyer got Taylor to his feet and searched him, substantially without incident, and about a minute later was placed in the back of Holtmeyer's cruiser. Filing 72-3 at 1:47-3:00; filing 72-2 at 19:56:12.

After his detention, during processing the next day at the Douglas County Correctional Center, Taylor reported that his eye was swollen and his neck hurt. Filing 78-5 at 38-39. (He also reported kidney pain, but that was from an unrelated medical condition. Filing 78-5 at 38.) He was given an over-the-counter painkiller, either ibuprofen or aspirin. Filing 78-5 at 40. There is no evidence of any lasting or permanent physical injuries resulting from the incident.

Taylor sued Holtmeyer in his individual and official capacities, along with the State of Nebraska and Omaha Police Department, alleging unconstitutional use of excessive force. Filing 1. Taylor's claims against the State and Police Department, and against Holtmeyer in his official capacity, were dismissed on initial review. Filing 12. Holtmeyer now moves for summary judgment on Taylor's remaining claim against Holtmeyer in his individual capacity. Filing 71.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to

---

² For the benefit of any reviewing court: a bystander can be heard saying, "Hey man, chill out, bro" at the beginning of the cellphone video; that can be heard at approximately 19:52:40 on the cruiser video. *Compare* filing 72-2 at 19:52:40-41 *with* filing 72-3 at 0:03-04.

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

The primary issue in this case is whether Holtmeyer is entitled to qualified immunity. Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Ransom v. Grisafe*, 790 F.3d 804, 810-11 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 838 (2016). This immunity applies to discretionary functions of government actors, including the decision to use force and to detain an individual. *Id.* To overcome the defense of qualified immunity, a plaintiff must show that the officer's actions violated a constitutional right that was clearly established at the time of their alleged misconduct. *Id.* In other words, the officer must have been plainly incompetent, or must have knowingly violated the law, when he used force to seize the plaintiff. *Id.*

So, for purposes of qualified immunity, the Court considers (1) whether Holtmeyer violated a constitutional right—here, whether Holtmeyer's use of force was objectively reasonable—and, (2) whether that right was clearly established at the time of the incident. Once the relevant predicate facts are established, the reasonableness of the officer's conduct under the

circumstances is a question of law. *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011); *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007); *see Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). And the ultimate question of qualified immunity is also one of law, once the predicate facts are determined. *Littrell v. Franklin*, 388 F.3d 578, 584-85 (8th Cir. 2004).

### 1. FOURTH AMENDMENT REASONABLENESS STANDARD

A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Determining the objective reasonableness of a particular seizure under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* This inquiry requires analyzing the totality of the circumstances, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation and quotation omitted). This allows for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citation and quotation omitted).

Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency. *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015). Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The key question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772 (8th Cir. 2014); *see Schoettle v. Jefferson Cty.*, 788 F.3d 855, 859 (8th Cir. 2015). The Court looks to the specific circumstances, such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Peterson*, 754 F.3d at 600.

### 2. CLEARLY ESTABLISHED RIGHT

For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015). It is unnecessary to have a case directly on point, but existing precedent must

have placed the statutory or constitutional question beyond debate. *Id.* at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.* (citing *Plumhoff*, 134 S. Ct. at 2023). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotation omitted). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quotation omitted).

The Court evaluates the defense of qualified immunity from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation. *Id.* Thus, if an officer acts in a manner about which officers of reasonable competence could disagree, the officer should be immune from liability. *Johnson v. Schneiderheinz*, 102 F.3d 340, 341 (8th Cir. 1996).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009). Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. *Id.* at 206.

### 3. TAYLOR'S ARGUMENT

Taylor, supported by expert opinion evidence, focuses on three aspects of Holtmeyer's conduct. First, Taylor questions Holtmeyer's initial approach to the Tahoe, contending that it was reckless, that Holtmeyer could not have seen the firearm when he opened the vehicle's door, and that he pushed Taylor into the vehicle's front seat. Filing 76 at 12-13, 16-19. Second, he contends that Holtmeyer's use of a chokehold was an objectively unreasonable use of "deadly force." Filing 76 at 19-20. And finally, he

contends that Holtmeyer's blow to Taylor's head was also an unreasonable use of "deadly force." Filing 76 at 20. Based on those contentions, Taylor also argues that Holtmeyer violated Taylor's clearly established right to be free from excessive force. Filing 76 at 22-24.

(a) Approach to Vehicle

First, Taylor takes issue with Holtmeyer's initial approach to the vehicle, relying upon the opinion of his expert witness, Professor Seth Stoughton,[3] who opined that "Holtmeyer's approach of the Tahoe was reckless, unreasonable, and contrary to generally accepted police practices and led to the unnecessary use of force against Taylor." Filing 76 at 12; *see* filing 78-6 at 4. Stoughton opined that Holtmeyer should not have rushed toward the vehicle, and that "[a]n officer who unreasonably puts himself in a threatening situation causally contributes to the use-of-force that he employs to manage that threat." Filing 78-6 at 4.

But it is well-established in the Eighth Circuit that the Court must focus on the use of force itself, not the events leading up to it: there must be evidence that the seizure itself, not its prologue, was unreasonable. *Gardner v. Buerger*, 82 F.3d 248, 253-54 (8th Cir. 1996); *Schulz v. Long*, 44 F.3d 643, 648-49 (8th Cir. 1995). Evidence that Holtmeyer "created the need to use force by [his] actions prior to the moment of seizure is irrelevant to the issues presented here." *Schulz*, 44 F.3d at 649. Unreasonable police behavior before the use of force does not make the use of force unconstitutional. *Gardner*, 82 F.3d at 253. There is no dispute in this case that Holtmeyer had reason to seize Taylor. Nor is there any authority or evidence to support a finding that Holtmeyer acted *unconstitutionally* in drawing his sidearm and approaching the vehicle.

Taylor also takes issue with the statement in Holtmeyer's affidavit that when he opened the door of the Tahoe, "[a]t this moment" he had seen a handgun on the floor of the vehicle. Filing 72-1 at 2. Taylor parses the cruiser video at length for evidence that Holtmeyer could not have seen the weapon then. Filing 76 at 16-18. The evidence is not as compelling as Taylor suggests: the fact that officers later leaned forward into the vehicle to more easily see the weapon does not foreclose the possibility that Holtmeyer saw it without doing so. Holtmeyer admitted at his deposition that he saw the gun when he opened the door or "soon after that." Filing 78-1 at 84-85. And the record establishes that point with some certainty: no more than 20 seconds elapsed

---

[3] Stoughton is a former police officer and martial arts instructor who currently teaches criminal law and criminal procedure at the University of South Carolina School of Law, where he also conducts academic research on policing. Filing 78-6 at 1. The Court accepts his expertise for purposes of this motion.

- 8 -

between Holtmeyer opening the car door and the two men falling out of the car to the ground, and Holtmeyer must have seen the gun during that time, because the first thing he did when his backup arrived was direct them to the weapon, and he hadn't had another opportunity to look into the vehicle.

But more fundamentally, the Court does not see why it is a matter of *constitutional* significance whether Holtmeyer saw the weapon instantly upon opening the car door, or a few seconds later. Holtmeyer was candid at his deposition about being unable to pinpoint the exact moment when he had seen the gun, and the evidence establishes that the weapon was there and that he saw it while the two men were standing near the car door. The precise timing of when Holtmeyer saw the weapon does not make a difference in whether the force Holtmeyer ultimately used was objectively reasonable.

Finally, Taylor contends that Holtmeyer pushed him into the vehicle—or, at least, that there is a factual issue as to whether Holtmeyer pushed him. Because the predicate facts are substantially established by the video recording of the incident, Taylor's tactic seems to be to persuade the Court that there are factual issues with what the video actually depicts. Stoughton opined that Holtmeyer intentionally forced Taylor into the car because, in Stoughton's opinion, Holtmeyer's attempt to grasp Taylor's armpit would not have been an effective technique to pull a suspect backward, but would be a technique for bringing a suspect to the ground. Filing 78-6 at 5.

But from both Holtmeyer's testimony and the objective video evidence, it is clear to the Court that—at worst—Holtmeyer inadvertently pushed Taylor down. The video is, in fact, entirely consistent with Holtmeyer's testimony, and absent any suggestion that the recording's depiction is inaccurate, the Court may rely upon it. *See Scott*, 550 U.S. at 379-80. It is apparent to the Court that Holtmeyer put his left arm between Taylor and the vehicle and was trying to get control of Taylor with his right hand when the two men lost their balance. Taylor's testimony, that he felt Holtmeyer push him from behind, is not inconsistent with that—Taylor would certainly have felt Holtmeyer's weight against him, causing him to lose his balance.

That said, even if there was a *genuine* factual dispute about whether Holtmeyer intentionally pushed Taylor, it is unclear why that dispute would be *material*. Such a push would not be unconstitutionally excessive force, and Taylor does not argue that it was. The only purpose seems to be to establish a narrative in which Taylor was completely cooperative, so that Holtmeyer's later use of force was unreasonable. But that is a separate point.

(b) Use of Force

Taylor's primary contentions are that Holtmeyer's hold around his neck, and later blow to the head, were objectively unreasonable. Taylor

argues that, seen in the light most favorable to him, the evidence would support a conclusion that he did not flee or resist arrest. And Stoughton opined that Holtmeyer acted unreasonably in applying a "respiratory choke" and then a blow to the head, because those were uses of "deadly force" which are unwarranted unless "an officer reasonably perceives that they or another person is threatened with death or great bodily harm." Filing 78-6 at 7-9.

But, to begin with, Stoughton's opinion regarding the use of "deadly force" is inconsistent with the Supreme Court's opinion in *Scott v. Harris*. In *Scott*, a pursuing officer in a car chase used a dangerous maneuver to stop the plaintiff's vehicle, and the plaintiff was injured. 550 U.S. at 375. The plaintiff argued in his subsequent civil suit that the officer's actions constituted "deadly force" that is only warranted if: a suspect poses an immediate threat of serious physical harm to others, deadly force is necessary to prevent escape, and where feasible the officer gives the suspect some warning. *Id.* at 382 (citing *Tennessee v. Garner*, 471 U.S. 1, 9-12 (1985)). But the *Scott* Court rejected the plaintiff's reliance on *Garner*, explaining that

> *Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." *Garner* was simply an application of the Fourth Amendment's "reasonableness" test . . . to the use of a particular type of force to a particular situation. . . . Although [plaintiff's] attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of "reasonableness." Whether or not [the officer's] actions constituted application of "deadly force," all that matters is whether [the officer's] actions were reasonable.

*Id.* at 382-83. In other words, Taylor's characterization of the force used as "deadly" does not have legal significance.

Stoughton downplays the significance of the weapon, and Taylor's conduct, opining that "Taylor was not aggressive or assaultive" and that Taylor's "active resistance" was not "automatically elevate[d] . . . to the level of a deadly threat" by the presence of the weapon. Filing 78-6 at 7. But the Court finds it hard to reconcile that reasoning with the standards that govern the *legal* question whether conduct is constitutionally unreasonable—which, it bears recalling, is a question of law. "An expert's after-the-fact opinion that danger was not 'imminent' in no way establishes that there was no danger, or that a conclusion by the officer[] that it *was* imminent would have been

wholly unreasonable." *Whitley v. Albers*, 475 U.S. 312, 323 (1986).[4] Taylor—whom Holtmeyer believed to be armed and dangerous—was within arm's reach of a firearm, and was at the very least not entirely cooperative. Holtmeyer faced precisely the sort of split-second decision that the relevant Fourth Amendment standards acknowledge, and precisely the sort of grey-area judgment call that qualified immunity is intended to protect.

Stoughton also explains why, in his opinion, Holtmeyer's hold around Taylor's neck was not reasonable. Stoughton details the difference between a "lateral vascular neck restraint," which is a "dangerous technique" but does not interfere with breathing when properly performed, and a respiratory choke, which obviously does interfere with breathing and which Stoughton says Holtmeyer applied. Filing 78-6 at 8-9. Stoughton concedes that Holtmeyer's "initial hold may have been reasonable under the circumstances," but that the use of a respiratory choke was unreasonable. Filing 78-6 at 8.

Holtmeyer's testimony, of course, was that he was simply trying to get a grip on Taylor and drag him out of the car by whatever means were available—not really a "technique" at all. And the video recording supports that testimony—what appears on the video is mostly awkward grappling. Stoughton's opinion seems to be that once Holtmeyer had pulled Taylor out of the vehicle, he should have used another technique to try and hold Taylor and secure custody. It is telling that Stoughton does not explain what that technique would have been. The Court's assessment of the video recording suggests that Holtmeyer's hold became a "respiratory choke" primarily because Taylor shifted position while trying to twist free of Holtmeyer's grip. But the Court need not resolve that matter because the question, for qualified immunity purposes, is not whether Holtmeyer chose poorly—it is whether a reasonable officer, in Holtmeyer's position, could have believed that it was reasonable to continue holding Taylor around the neck for the few seconds it took to bring Taylor to the ground. There may be room for reasonable people to disagree on that point—but that Holtmeyer "arguably erred in judgment" when choosing to "employ[] potentially deadly force. . . . falls far short of a showing that there was no plausible basis" to believe "that this degree of force was necessary." *See Whitley*, 475 U.S. at 323.

Stoughton also opined that the later blow to Taylor's head "create[d] a substantial risk of serious bodily injury." Filing 78-6 at 9. But any such risk was not realized, and it is significant that Taylor suffered only minor injuries.

---

[4] *Whitley* was an Eighth Amendment case, but the Supreme Court's discussion of the difference between "mere negligence" and "wanton conduct," 475 U.S. at 322, is helpful, particularly in the context of qualified immunity.

The Court is aware that evidence of only de minimis *injury* does not necessarily foreclose a claim of excessive force under the Fourth Amendment. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). The appropriate inquiry is whether the *force* used to effect a particular seizure is reasonable. *Id.* It is logically possible to prove an excessive use of force that caused only a minor injury, and the rule should focus on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used. *Id.* But a de minimis use of force is insufficient to support a claim, and it may well be that a plaintiff showing only de minimis injury can show only a corresponding de minimis use of force—the degree of injury is relevant insofar as it tends to show the amount and type of force used. *Id.* Characterizing the force used here as creating a risk of serious injury does not change the fact that Taylor was not significantly injured, which suggests in turn that the amount of force actually used—regardless of what *could* have happened—was not particularly significant either.

Taylor also calls attention to Stoughton's opinion that Holtmeyer's use of force was contrary to Omaha Police Department policy. Again, even assuming that to be the case, it does not have legal significance—the issue under § 1983 is whether Holtmeyer violated the Constitution or federal law, not whether he violated departmental policy. *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993). Conduct by an officer that violates some state statutory or administrative provision is not necessarily constitutionally unreasonable, because state legislatures and government agencies are free to hold officers to higher standards than the Constitution requires. *Id.* And "[e]ven if an officer acts contrary to [his] training . . . that does not itself negate qualified immunity where it would otherwise be warranted." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015).

"Rather, so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a . . . confrontation was imprudent, inappropriate, or even reckless." *Id.* (citation and quotation omitted). In close cases, a jury does not automatically get to second-guess these life and death decisions, even though a plaintiff has an expert and a plausible claim that the situation could better have been handled differently. *Id.*

It is, nonetheless, easy to see these events from Taylor's perspective, and why he found them upsetting. From Taylor's point of view, he was driving down the street, minding his own business, when he was accosted by police. He had no reason to know that by borrowing a car, he had inadvertently become a wanted man. He pulled into a parking space and saw a police officer pointing a gun at him and shouting, for no reason he was

aware of. With very little time to consider what was happening, he got out of his vehicle to find himself manhandled and then thrust back into the car. Only a few seconds after first encountering police, he was grabbed around the neck and pulled to the ground, then choked when he tried to get up. When he grasped at the arm around his neck, he was hit in the head, then taken to the ground and handcuffed. All of that happened very quickly—about 2 and a half minutes between Holtmeyer activating his cruiser's lights and putting Taylor in handcuffs—and it certainly must have been confusing. The Court does not mean to understate how shocking that must have been for Taylor.

But it is also easy to see these events from Holtmeyer's perspective—or, more pertinently, from the perspective of a reasonable officer in that situation. He saw a vehicle that he reasonably believed to belong to a wanted, violent criminal, who was reported to be armed and dangerous. After pulling in behind the suspect's vehicle, he saw the suspect attempt to back out, even though the cruiser was behind the vehicle with lights flashing—possibly suggesting an attempt to flee. At some point after opening the door to the vehicle, he saw a weapon on the floor under the front seat, well within the suspect's reach. Then the suspect fell back into the car—it does not particularly matter how—only inches from the weapon. The officer pulled the suspect out of the car and to the ground, but the suspect immediately tried to get up and pull out of the officer's grasp, in the general direction of the open car door. And then the suspect grabbed at the officer's arm, which was the only hold the officer had on the suspect. An officer in that situation could reasonably believe that continuing to hold the suspect around the neck, and striking a blow to the head with his free hand, was necessary in those "tense, uncertain, and rapidly evolving circumstances" to prevent the suspect from reaching his vehicle and weapon, and to place the suspect in custody.

And that conclusion is all that is required to establish Holtmeyer's right to qualified immunity. The correct inquiry, the Supreme Court has explained, is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation [he] confronted"—an area "in which the result depends very much on the facts of each case[.]" *Mullenix*, 136 S. Ct. at 309 (quoting *Brosseau v. Haugen*, 543 U.S. 194 (2004)) (quotations omitted). The question is "whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). And Holtmeyer is "entitled to qualified immunity because none of the cases *squarely governs* the case here." *Id.* (citation and quotation omitted) (emphasis in original).

The Court is aware of no precedent, and Taylor does not cite the Court to any precedent, that puts it "beyond debate" whether Holtmeyer acted

- 13 -

unreasonably in this case. *See id.* To overcome qualified immunity, a plaintiff typically must identify either cases of controlling authority in their jurisdiction at the time of the incident or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful. *Jacobson v. McCormick,* 763 F.3d 914, 918 (8th Cir. 2014) (citing *Wilson v. Layne,* 526 U.S. 603 (1999)) (quotations omitted). The cases cited by Taylor here are, in the Court's view, meaningfully distinguishable, primarily because there was evidence in each case that the suspect being taken into custody was offering no resistance to the arresting officer, and no reason to believe the suspect had a weapon or access to one. *See, Samuelson v. City of New Ulm,* 455 F.3d 871, 877 (8th Cir. 2006); *Thompson v. Zimmerman,* 350 F.3d 734, 735 (8th Cir. 2003); *Kukla v. Hulm,* 310 F.3d 1046, 1050 (8th Cir. 2002); *Lambert v. City of Dumas,* 187 F.3d 931, 933-34 (8th Cir. 1999).[5] Having reviewed the evidence in this case, the Court finds that a reasonable officer in Holtmeyer's position *could* have seen Taylor's behavior as noncompliance and then resistance, and believed such behavior in close proximity to a weapon warranted a use of force. While the Court must view the evidence in the light most favorable to Taylor, the Court must also afford Holtmeyer "substantial latitude in interpreting and drawing inferences from factual circumstances[.]" *Meehan v. Thompson,* 763 F.3d 936, 942 (8th Cir. 2014) (citation and quotation omitted). It is also worth noting that in each case relied upon by Taylor, the Eighth Circuit found factual issues precluded summary judgment—in other words, the Court of Appeals found there were questions about whether excessive force had been used, which is not the same thing as answering those questions so as to "clearly establish" that the force used was unwarranted in those circumstances.

On the other side of the ledger is the Eighth Circuit's decision in *Nelson v. County of Wright*, in which the Court of Appeals reviewed a conclusion that, even viewing the evidence in the light most favorable to the plaintiff, an officer's actions had been objectively reasonable when he used potentially deadly force to subdue the plaintiff. 162 F.3d 986 (8th Cir. 1998). In *Nelson*, the officer had been informed that the plaintiff was suicidal and had been acting violently, and that he had taken a number of unknown pills. The plaintiff actively resisted the officer's efforts to arrest him, leading to a struggle in which the plaintiff at one point reached for the officer's gun and then knocked the officer down. At some point, the officer struck the plaintiff over the head with his baton. After being knocked down a second time, the

---

[5] *Samuelson*, *Thompson*, and *Kukla* also involved significantly more force, and correspondingly more serious injury, than occurred in this case. *See Samuelson,* 455 F.3d at 876; *Thompson,* 350 F.3d at 735; *Kukla,* 310 F.3d at 1050.

- 14 -

officer fired his gun and wounded the plaintiff. The entire incident lasted less than 3 minutes. *Id.* at 988-89. The Eighth Circuit found the officer was entitled to qualified immunity, explaining that

> [the plaintiff]'s hostility and increasingly violent reaction gave [the officer] reason to fear grave personal injury. It is not disputed that during the struggle, [the plaintiff] reached for [the officer]'s gun and shoved [the officer] onto the floor and into the closet. Even when the facts are viewed in the light most favorable to [the plaintiff], it is clear that the physical fight was intense and that there would have been little time for the officer to reflect as the situation quickly escalated. [The plaintiff] now tries to analyze the brief struggle as if the incident were composed of distinct and separate segments. At the time, however, it was uncertain what would happen next. The situation was tense and rapidly evolving. An officer's actions are not to be assessed with 20/20 hindsight when he was faced with the need to make instantaneous decisions. After carefully reviewing the record, we conclude that under the circumstances encountered by [the officer], a reasonable officer could have believed that the use of potentially deadly force was not excessive or in violation of the clearly established law requiring an objectively reasonable response.

*Id.* at 990-91 (citations and quotations omitted).

The Court recognizes that *Nelson* is distinguishable on some points. In particular, the plaintiff in *Nelson* offered more palpable resistance—but, on the other hand, the officer in *Nelson* used correspondingly greater force. As in *Nelson*, Holtmeyer faced a suspect who he had reason to believe might be dangerously violent. That belief was based in part on a misunderstanding, caused by Taylor's borrowed vehicle, but an act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment. *Capps v. Olson*, 780 F.3d 879, 885 (8th Cir. 2015). And like the officer in *Nelson*, Holtmeyer faced a "tense and rapidly evolving" situation, with "little time . . . to reflect as the situation quickly escalated." 162 F.3d at 991.

The Court also notes *Smith v. City of Minneapolis*, in which an officer was dispatched to a domestic dispute after it was reported that a man was reportedly armed with a rifle and "ready to fight." 754 F.3d 541, 544 (8th Cir. 2014). The responding officer located the suspect running outdoors near the scene of the report, but without a rifle. The officer drew his weapon and

ordered the suspect to the ground. The suspect turned to face the officer, with his hands in front of his face and his palms down, but did not drop to the ground. The officer approached the suspect and attempted to get him to the ground by kicking him in the thigh and punching him in the head. The suspect turned and ran, and managed to escape by tumbling over a fence. The suspect was eventually caught and substantial force was used to subdue him, after which it was discovered that he was not breathing, and he died on the way to the hospital. *Id.*

The Eighth Circuit found that each of the officers involved was entitled to qualified immunity, but it is the first, initial encounter that is factually relevant here. The plaintiff in *Smith*—supported by expert opinion testimony—argued that it was unreasonable for the officer to approach the suspect and use force when the suspect did not behave aggressively and appeared to be trying to surrender. The Court of Appeals rejected that argument, reasoning that

> in the "particularized" situation here, an officer attempted to effectuate an arrest by ordering the suspect to the ground, that is, a large and potentially armed man who was suspected of domestic abuse and making threats with a gun. The man refused to comply with the officer's orders. To get this suspect to the ground and apply handcuffs in order to control the suspect and protect the police and the public, the officer approached the suspect and attempted to subdue him with a hit and a kick, not deadly force. [The plaintiff] has not cited any case that would render the "constitutional question beyond debate" and would put [the officer] on notice that such actions during this first encounter would violate [the suspect]'s constitutional right to be free from unreasonable seizure. [The plaintiff] only cites [the expert]'s obviously hindsight-based report, which does not constitute clearly established law. Because we do not find any clearly established law supporting [the plaintiff]'s claim, and any violation is not obvious, [the officer] is entitled to qualified immunity for his actions during his initial encounter with [the suspect].

*Id.* at 547.

Again, *Smith* is potentially distinguishable—but, as in *Smith*, Holtmeyer faced a man suspected of domestic abuse and possession of a firearm, and it was reasonable for Holtmeyer to conclude that Taylor was at least passively resisting Holtmeyer's attempt to take him into custody. *Smith*

is not precisely on point, but it is sufficiently comparable to illustrate why Holtmeyer's conduct was at the very least debatable. In light of *Nelson* and *Smith*, the Court cannot find that it was "clearly established" that Holtmeyer's use of force was unreasonable in the circumstances he faced. *See also, e.g., Blazek v. City of Iowa City,* 761 F.3d 920, 924 (8th Cir. 2014); *Wertish v. Krueger,* 433 F.3d 1062, 1066-67 (8th Cir. 2006).

In sum, the Court finds that even if it could be said, when the evidence is seen in the light most favorable to Taylor, that Holtmeyer's use of force was unreasonable, existing precedent does not place that conclusion beyond debate. Taylor's right to be free from "excessive force" may have been clearly established, but the Supreme Court has repeatedly instructed that "[q]ualified immunity is no immunity at all if 'clearly established' law" can be defined at such a "high level of generality." *Sheehan,* 135 S. Ct. at 1776 (citation and quotation omitted). And "where the use of force alleged here likely resides on the hazy border between excessive and acceptable force," the Court "cannot conclude that only a plainly incompetent officer would have believed the force used . . . was constitutionally reasonable." *Blazek,* 761 F.3d at 924 (citation and quotations omitted). The Court need not definitively resolve the underlying question whether Holtmeyer used excessive force because it finds that Holtmeyer is entitled to qualified immunity. *See Pearson,* 555 U.S. at 236. Holtmeyer's motion for summary judgment will be granted on that basis.

IT IS ORDERED:

1. Holtmeyer's motion for summary judgment (filing 71) is granted.

2. Taylor's remaining claim is dismissed.

3. A separate judgment will be entered.

Dated this 21st day of April, 2016.

BY THE COURT:

*[signature: John M. Gerrard]*

John M. Gerrard
United States District Judge